Spencer (R).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA



WORLD WIDE SUNNI(MUSLIM) )
COMMUNITY AT NOTTOWAY )
CORRECTIONAL CENTER, )
CHRYSTOPHER LEE #176385 )
PLAINTIFF. )
NOTTOWAY CORRECTIONAL CENTER )
P.O. BOX 488 )
BURKEVILLE, VA 23922 )
 )
 )
VS. )    CIVIL ACTION  3:08CV99
 )    NO:
 )
 )
PATRICK GURNEY )
ASSISTANT WARDEN )
NOTTOWAY CORRECTIONAL CENTER, )
IN INDIVIDUAL AND OFFICIAL CAPACITY )
DEFENDANT. )
NOTTOWAY CORRECTIONAL CENTER )
P.O. BOX 488 )
BURKEVILLE, VA 23922 )
 )
DOUGLAS M. VAUGHN )
WARDEN )
NOTTOWAY CORRECTIONAL CENTER, )
IN INDIVIDUAL AND OFFICIAL CAPACITY )
DEFENDANT. )
NOTTOWAY CORRECTIONAL CENTER )
P.O. BOX 488 )
BURKEVILLE, VA 23922 )
 )
G.K. WASHINGTON )
REGIONAL DIRECTOR FOR )
THE CENTRAL REGION, )
IN INDIVIDUAL AND OFFICIAL CAPACITY )
DEFENDANT. )
10501 TRADE COURT )
RICHMOND, VA 23226 )
 )
ET Als. )
 )



## COMPLAINT and BRIEF in SUPPORT
## UNDER CIVIL RIGHTS Act 42 U.S.C.
## SECTION 1983.

The Plaintiff in proper person and proceeding Pro se and IN FORMA PAUPERIS status in the above styled action affirms the Following:

1) He has not begun or is party to any other lawsuits in any state or Federal court relating to his imprisonment.

2) In accordance with the Prison Litigation Reform Act of 1995, (PLRA), Pub.L. No. 104-134, 110 Stat. 1321 (1996), Amended 42 U.S.C. section 1997e, that he has exhausted all administrative remedies available to him, related to this present matter in the manner prescribed by VDOC Departmental operating Procedure (DOP)#866 in the following fashion:

a) On 5-17-07 he did file Informal complaint #S-490 to the Nottoway Correctional Center (NCC) Operations Officer.

b) On 5-29-07 he did file subordinate regular grievance #220-11665, which was determined to be "UNFOUNDED" in Level ONE Response by Warden Vaughn 6-27-07.

c) On 6-30-07 he appealed Level ONE Response in #220-11665 to G.K. Washington, REGIONAL DIRECTOR of the CENTRAL REGION. Who upheld the decision of the Level ONE respondent on 7-17-07.

## CLAIMS PRESENTED

1) The Nottoway Correctional Center policy denying group prayer on the recreation yard and it's implementation, Unconstitutionally restricts the Free excercise of Religion rights of the members of the World Wide Sunni Muslim Community in Violation of the United States Constitutions (U.S.C.) First Amendment.

2) The Restriction on Religious Prayer and process by which restrictions on religious Activities were implemented by Nottoway Correctional Center and supported by the Virginia Department of Corrections, willfully violates the Standards established by the Religious Freedom Restoration Act(RFRA) and the Religious Land use and Institutionalized persons Act of 2000(RLUIPA),42 U.S.C.

Section 2000 et seq.

3) Nottoway Correctional Center's Warden Vaughn and Virginia Department of Corrections (VDOC) Regional Director Washington, violated plaintiff's rights to equal protection and due process, in violation of the fifth and fourteenth amendments of the United States Constitution, by adopting and enforcing religious prayer restrictions, and during the informal complaint and regular grievance procedures.

## STATEMENT of THE CLAIM

[1] Plaintiff LEE was born into the Sunni Muslim Faith and a devout and fully observing adherent housed at the Nottoway Correctional Center (NCC) since 1998 through the present time of the filing of the present action. At NCC the plaintiff holds the position of "IMAM" THE SPIRITUAL LEADER.

[2] During his time at NCC, he participated in and/or led Group Prayer (two or more participants) on both recreation yards without interrupting or distracting normal recreational activities from his arrival in 1998 through 2007. Prior to that he participated in and/or led group prayer at the Greensville Correctional Center from 1990-1998. Furthermore, since he entered the VDOC in 1989, the plaintiff has known and observed group prayer on the recreation yard to be a visable and common practice of the World Wide Sunni Community within the VDOC, as the prescribed prayer time of the mid-day, and afternoon prayers usually occur while outside recreation is in progress.

[3] SALAT "Prayer for Forgiveness" is performed five times a day at prescribed times, and is obligatory for all Sunni Muslims. Also, as established in **AZIZ V. LeFEVRE**, 642 F.2d 1109,1110 (C.A.2(N.Y.),1981) "This "Prayer for Forgiveness" incurs greater blessing when performed in groups, which is the common practice of Sunni Muslims, than when performed alone;

The prayer must be so observed absent a valid excuse."

[4] The tenet of group salat comes from the "HOLY QUR'AN" in surah 2, ayat 43, and numerous other Hadeeth's or sayings of the PROPHET MUHAMMAD (s.a.w) instructing the faithful to make salat in groups of two or more. In fact the making of group salat by members of the WORLD WIDE SUNNI COMMUNITY, is iconic and universally recognized/identified with the sunni faith.

[5] The common practice of group salat being made in unobtrusive area's of the the large recreation yard, came under scrutiny and attack during what can only be described as NCC'S campaign against everything concerning muslims, and ISLAM in general. Which began when then Major Vaughn ascended to the position of Warden. Through a series of Memo's and unwritten policies and practices, restrictions were systematically placed on everything from where, when and how Sunni Muslims could pray, to when and where religious headgear could be worn.

[6] While Salat hours change based on the position of the Sun and Moon throughout the year, the basic time frame of the five obligatory prayer's is as follows **Morning prayer "FAJR" 4:06 a.m., Noon prayer "DHUR" 1:09 p.m., Afternoon prayer "ASR" 5:13 p.m., Evening prayer "MAGHRIB" 8:27 p.m. Night prayer "ISHAA" 9:27 p.m.**

[7] On 5-13-07 the plaintiff was called to the NCC Watch Commander Office following Dhur (noon) prayer, for leading 4 muslims in salat (in an unobtrusive section of the yard). Acting Watch Commander Captain White instructed the plaintiff, that he could no longer lead or participate in group salat on the Recreation Yard during any recreation periods.

[8] Recreation yard access is granted on a daily step-up rotation to NCC inmates on the following basis: First rec. 9:00 a.m.- 10:00 a.m., Second rec. 10:00 a.m.- 11:00 a.m., Third rec. 12:30p.m.- 1:45 p.m., Fourth rec. 1:50 p.m. - 3:00 p.m.. While first and second rec periods remain constant throughout the year, during spring and summer months third rec is extended from 4:30 p.m. - 7:15 p.m. or based on the descretion of the night watch commander and the setting of the Sun. Based on this timetable the DHUR prayer and ASR prayer

are negatively impacted.

[9] The plaintiff sought good faith resolution to what he immediately recognized to be a violation of his religious exercise and Freedom rights, in informal complaint #S-490. In #S-490 the plaintiff clearly assert's his rights under both the "RFRA" and "RLUIPA", while also establishing the legal criteria the defendant's were bound to meet under Federal Law.

[10] Failing to gain any relief or a clear statement from prison officials as to what legitimate penological interest was being served by forcing members of the WORLD WIDE SUNNI COMMUNITY at NCC to pray differently from their Sunni brothers world wide, the plaintiff filed regular grievance #220-11665. Further establishing his constitutional Rights and seeking a plain statement from Defendant Vaughn, as to what legitimate penological interest is being served by his Religious restriction policy.

[11] In response to #220-11665, Warden Vaughn fails to acknowledge that his actions -EMPHASIS ADDED_ constitutes the implementation of new policy enforcing religious restrictions. Preferring rather to seek to rely on irrelevant "in-room" supervision and D.O.P #841.3 criteria. Warden Vaughn's reasoning and logic is flawed and in err, because prayer in individual capacity is still being conducted and permitted on NCC rec yards, and this was implicitly established by Warden Vaughn in his 5-13-07 conversation with Watch Commander Captain White. This being the case, the "in-room" supervision reliance must be invalidated. Second, D.O.P #841.3 which he next seeks to rely on regards "offender Religious Programs" and also requires as grounds for restriction or discontinuance of religious programs the demonstration of "legitimate concerns regarding Security, Safety, Facility order, Space, or Resources." Even if the making of Salat on the recreation yard in it's broadest interpretation is considered to be an "offender religious program," Warden Vaughn has failed to demonstrate the requisite "legitimate concern/ interest" which the policy requires and the plaintiff has sought all along.

[12] The plaintiff then appealed the level one decision in #220-11665 (cited as 220-11664 in level two response) to Regional director G.K. Washington on 6-30-07. In his appeal the plaintiff further asserted his right's under the United States Constitutions First Ammendment and both the RFRA and RLUIPA. Second, he asserted the level one response of Warden Vaughn fails to state what "legitimate penological interest is being served by forcing members of the WORLD WIDE SUNNI COMMUNITY to pray individually on the recreation yard, and how this new policy is the "least restrictive means" of serving that unasserted interest. Third, the plaintiff contended that Warden Vaughn sought to rely on VDOC policy requiring "in-room" DOC staff supervision of all Religious activities, as grounds for discontinuing group salat on the recreation yard, when in reality there is DOC Staff supervision on the recreation yard at all times and multiple group activities already take place there under existing supervision provisions.

[13] In his level two response, Regional Director Washington also finds the plaintiffs claims to be "UNFOUNDED" in toto, granting no relief and exhausting all administrative remedies for the plaintiff. Even though, throughout the entire informal and formal process NCC and VDOC failed to demonstrate and "legitimate concerns regarding security, safety, facility order, space, or resources.", or respond to the grounds and issues squarely placed before them by the plaintiff.

[14] Barring these requisite threshold showings, NCC and VDOC have failed their own standard of validity tests, and applicable provisions under Constitutional law, including the RLUIPA and the Prisoner Litigation reform act. Thus forcing the plaintiff to bring this matter to FEDERAL COURT for adjudication and Final Resolution.

## ESTABLISHMENT OF THE CLAIM

1) The Nottoway Correctional Center policy denying Group prayer on the Recreation Yard and it's implementation unconstitutionally restricts the Free exercise of the Religious rights of the members of the WORLD WIDE SUNNI MUSLIM COMMUNITY in violation of the United States Constitutions First Ammendment. (U.S.C.)

[15] In Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972), the U.S. Supreme Court instructed that in order to establish a right under the First Amendment's Free exercise of religion clause, the plaintiff must make two threshold showing. First, he must show that he sincerely holds his Religious Beliefs or in plain language that he is an active and practicing member of that religion. Second, he must demonstrate that his claim is rooted in Religious belief and is not "Purely Secular" in Nature/Practice. Once these thresholds are surmounted, the burden of persuasion rest with the defendant's, to demonstrate that the prison regulation which impinges upon the plaintiff prisoner's protected constitutional right, is valid because it is "resonably related to legitimate penological interests". Turner v. Safely, 482 U.S. 78,89 (1987).

[16] The plaintiff contends that he readily surmounts the two pronged <u>Yoder</u> threshold showing. First, the plaintiff was born into the Sunni faith and has been the resident IMAM (leader of the community) for the last four years. Prrison Program records will further substantiate that the plaintiff has been prolific in both attendance and participation in Sunni Muslim activities, during this time period of his present incarceration. Second, the Sunni Muslim practice of making group salat is the most universally recognizeable tenet of the Sunni Muslim Faith, which as previously demonstrated is deeply rooted in the verses of the HOLY QUR'AN. "The prayer must be so observed absent a valid excuse." <u>Aziz v. LeFevre</u>, 642 F.2d 1109, 1110 (C.A.2(N.Y.),1981).

[17] This being the case, the burdens of production and persuasion rested solely with Defendant's Gurney, Vaughn, and Washington; throughout the informal and formal grievance procedure as well as now to demonstrate how their policy of restricting group salat while allowing individual salat on the recreation yard, and subsequent level one and level two are "reasonably related to legitimate penological interests." <u>I.d.</u> <u>Safely</u> at89.

[18] At a more basic level this failure by the defendants to demonstrate and duely state how and what legitimate penological interest was being served throughout the aforementioned proceedings, undermines the intent of 42 U.S.C. section 1997e(a). "Section 1997e(a), designed to reduce the quantity and improve the quality of prisoner suits, affords corrections officials an oppurtunity to address complaints internally before allowing initiation of a Federal Case. In some instances,... and for cases ultimately brought to court, an administrative record clarifying the controversy's contours could facilitate adjudication." <u>Porter v. Nussle</u>, 534 U.S. 516, 516-17 (2002).

[19] Finally, in order to sustain a cognizable First Amendment Free exercise of religion claim, the plaintiff need only show that his right to the Free exercise of his religion has been "substantially burdened" by the implimentation and enforcement of policies by the defendants. While the Fourth Circuit has not yet interpreted the meaning of the "substantial burden" requirement, several other circuits have; <u>McEachin v. McGuinnis</u>, 357 F.3d 197 (2d cir.2004), <u>Adkins v. Kaspar</u>, 393 F.3d 559 (5th cir. 2004), <u>Civil Liberties for Urban Believers v. City of Chicago</u>, 342 F.3d 752 (7th cir. 2003), <u>Murphy v. Mo. Department of Corrections</u>, 372 F.3d 979(8th cir. 2004), <u>Warsoldier v. Woodford</u>, 418 F.3d 989(9th cir. 2005), <u>Midrash Sephardi,inc. v. Town of Surfside</u>, 366 F.3d 1214 (11th cir. 2004).

[20] While these decisions waver slightly from conservative to liberal perspectives, the crux of them all remains, that when a government action or policy pressures an adherent to significantly modify his religious behavior, or bears direct primary responsibility for rendering religious exercise effectively impractical, or constrains expression that manifests some central tenet of his individual religious beliefs, a "Substantial Burden" is manifested.

[21] By these standards the "Substantial burden" threshold is also surmounted by the plaintiff. As the established prohibitive policy, limits the blessing of ALLAH to World Wide Sunni Community Members at NCC by;
1) Forcing them to pray alone and, 2) Forcing them to pray differently from their Sunni brothers world wide.

[22] The Plaintiff contends that this policy which NCC now enforces and which Defendant Washington sanctions, constrains expression of a Central tenet of the Sunni Muslim faith and significantly modifies Sunni Religious behavior Nowhere else in the world will you find two or more Sunni muslims gathered together, forsake their belief, practice, and blessing of ALLAH, to seperate and go twenty or more feet away from each other to pray alone.

[23] This contention is exacerbated when viewed in light of the fact that prior to the enforcement of the policy at bar, Sunni Muslims had been making group salat on both recreation yards at NCC since at least 1998 when the plaintiff arrived there and every other Virginia Correctional Center he has been housed at, without any incidents which might tend to justify such broad and restrictive actions occuring. Also, it seems counter productive to the plaintiff to have the 2-6 sunni muslim adherents who normally make salat together during the various recreation periods on the two recreation yards, spread out around the yards to make an under ten minute prayer, Rather than pray together in a centralized area in "full view" of the guard towers while being monitored.

[24] In the past and quite likely even in this matter at hand prison officials have sought to use Jones v. North Carolina Prisoner's Union, 433 U.S. 119 (1977), as a coat of many colors- which some how empowers them to strip away Prisoner Constitutional rights with impunity, simply because of it's "appropriate deference" to prison administrators clause. However, if this clause "Were to be generally Followed, Prisoner's eventually would be stripped of all constitutional rights, and would retain only those privileges that] prison officials, in their "informed discretion," deigned to recognize." Jones v. North Carolina Prisoner's Union, 433 U.S. 119,147(1977).

[25] Furthermore, in JONES the court stipulated that while some prisoner's rights under the constitution may be limited, even those under the First Ammendment,

The "Challenges to prison restrictions that are asserted to inhibit First Amendment Interests must be analyzed in terms of the legitimate policies and goals of the Corrections system, to whose custody and care of the prisoner has been committed," I.D. Jones at125. Prison officials under Jones must still demonstrate that the curtailed activity and impinged right "possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment." I.D. Jones at 132.

> 2) The Restrictions on Religious Prayer and process by which restrictions on religious Activities were implemented by Nottoway Correctional Center and supported by the Virginia Department of Corrections, Willfully violates the standards established be the Religious Freedom Restoration Act (RFRA) and the Religious land use and Institutionalized persons Act of 2000 (RLUIPA), 42 U.S.C. Section 2000cc et seq.

[26] First, realizing that the U.S. Supreme Court invalidated RFRA as it applied to states and localities in CITY of Boerne v. Flores, 521 U.S. 507 (1997), the plaintiff simply cites it for the same reason the fifth Amendment is cited in Fourteenth Amendment claims.

[27] Next, in evaluating a claim under RLUIPA the same threshold burdens must be met by the plaintiff, as in a claim under the First Amendment's Free exercise of Religion Clause. The Plaintiff contends having demonstrated the surmounting of applicable thresholds in claim one, that the court deem them as satisfied in claim two as well.

[28] The Major diversion between a Free exercise clause claim and one under RLUIPA, is RLUIPA prohibits prison administrators from imposing "A substantial burden on the Religious exercise of a person residing in or confined to an institution," Unless the prison can first demonstrate that it's imposition is "(1) is in the Furtherance of a compelling governmental

interest; and (2) is the least restrictive means of furthering that compelling interest." EMPHASIS added. 42 U.S.C.A. Section 2000cc-1(a).

[29] Furthermore, RLUIPA employs a lower standard than the First Amendment's "Rooted in Religious belief" threshold for a Free exercise clause claim. The RLUIPA Threshold allows "Any exercise of Religion; whether or not compelled by, or central to, a system of religious belief," 42 U.S.C.A. Section 2000cc 5 (7)(a), to be established as a claim under the act, as long as the plaintiff demonstrates the belief is sincerely held---as in the present matter.

[30] Also it cannot be said that the Framers of the RLUIPA did not fore see or consider the chilling effect the Act would have on prison administrators and their reliance on rulings such as Jones v. North Carolina Prisoner's Union, supra. as the act was intended to restore the traditional protection afforded to prisoners to observe their religious beliefs unencumbered by superfluous prison restrictions. The RFRA and subsequently the RLUIPA marked a substantial turn away from the standards impressed by Jones and O'Lone v. Estate of Shabazz, 478 U.S. 342 (1987), back to requiring balancing test on the merits of each prisoner claim presented and affirmative duty of prison administrators to demonstrate the compelling justification for their actions.

[31] Throughout the informal and Formal grievance procedure, at no point does any of the Defendant's plainly state the compelling interests for the implementation of the religious restrictions of forcing individual prayer on a Religious community for whom group prayer is a major/central religious tenet and practice(group salat) they have enjoyed for at least the previous nine years, or how this policy was the least restrictive means of serving that interest. Even though this failure to demonstrate was clearly presented to the defendants at each successive step of the informal grievance procedure----- to each defendant.

[32] The Failure to demonstrate by NCC's Assistant Warden Gurney and Warden Vaughn, and choice to ignore the requirement to demonstrate by Regional Director Washington, Once squarely placed before them, shows a willfullness by the defendant's to violate the provisions of the RLUIPA which a "reasonable person in the Official's position would have known that his conduct would violate," Collinson v. Gott, 895 F.2d 994,998 (4th Cir.1990).

    3) Nottoway Correctional Center's Warden Vaughn and Virginia Department of Corrections (VDOC) Regional Director Washington, violated plaintiffs rights to equal protection and due process, in violation of the Fifth and Fourteenth Amendments of the United States Constitution, by adopting and enforcing religious prayer restrictions, and during the informal complaint and regular grievance procedures.

[33] The equal protection clause remains in force as a means of keeping governmental decision makers, in this case prison and correctional administrators, from treating differently persons who are in all relevant aspects alike. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432,440 (1985); Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). As such all the plaintiff need do in order to establish a successful equal protection claim, is demonstrate that he has been "Treated Differently from others whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." I.D. Morrison at 654.

[34] In all relevant aspects the prisoner's housed at NCC are all alike. In theory they all are entitled to the same level of care, housing, pod recreation, outside recreation, educational opportunities, program participation, and participation in any of the institutions' approved and recognized religious programs. By-Way-Of being a VDOC recognized and

authorized religious program, the Major tenets of the World Wide Sunni community Faith must also be respected and protected in order to constitute "Meaningful Religious practice."

[35] However, in intent and practice Warden Vaughn's policy in dispute and subsequent level one response, purposefully singles out religious practices observed only Sunni adherents for scrutiny and prohibition. These acts of and by themselves by definition constitute discrimination. Warden Vaughn's actions are deliberate, purposeful, and clearly the result of consideration, which results in discrimination against the World Wide Sunni Community at NCC, of which the plaintiff is a part

[36] Next either tacitly or implicitly regional director Washington under the color of authority of the VDOC and in an individual capacity, failed to protect or establish the plaintiffs equal protection clause rights, in in the wake of Defendant Gurney's and Vaughns' actions and rulings against the plaintiff. Director Washington had an affirmative duty to ensure that the plaintiff was treated fairly and that the equal protection clauses provisions were observed, as he was the last level of administrative review and remedy available to the plaintiff.

[37] A prison must operate with fairness in the management of the numerous decisions affecting the daily lives of prisoners. It's activities and decisions must be infused with elements of due process that substitute predictable, official behavior for prejudiced and irrational responses. Of all the elements of fairness that are essential to the operation of an institution, the existence of an effective grievance mechanism is perhaps the most important.

[38] Finally, the initial threshold inquiry in any due process claim is whether the plaintiff has demonstrated that he has been deprived of a protected liberty interest by the state. See Sandin v. Conner, 515 U.S. 472,477-78 (1995). In the matter at hand the due process issues raise to constitutional level, by-way-of the plain language of Sandin, in which the Supreme Court

establishes that a due process clause violation arises from a prison practice which "nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." I.D. Sandin at 477.

[39] The plaintiff contends that he retained a reasonable expectation to the continued practice of Key/Central tenets of his Sunni Faith, free from arbitrary and capricious suppression of his religious expression and observance. The atypical and significant hardship placed on the plaintiff in the present matter, is the way prison administrators have forced him to pray contrary to his religious beliefs, which certainly falls outside the ordinary incidents of prison life.

## RELIEF

The plaintiff understands that in a Section 1983 action the court cannot change his sentence, release him from custody or restore any lost good time.

The plaintiff wants the court to grant:

a) The plaintiff nominal and punitive damages in the amount of $100,000.00, from each of the defendant's in their idividual capacities.

b) Injunctive relief by halting and invalidating the group salat prohibition on the recreation yards as it applies to documented World Wide Surni Muslim adherents. Authorizing them to make group salat (prayer) on the recreation yard, at the times provided by a court approved Islamic Liasion.

c) An immediate injunction against retaliation against the plaintiff by the Defendant's or any other VDOC employee, to include punative transfer's, administrative/investigative hold, harassment,etc... As the plaintiff contends admonishment similar to 42 U.S.C.A. 1997d is required in this action.

d) ▬▬▬▬▬▬▬ Any aditional Relief The Court may deem Appropriate.

## PLACES OF INCARCERATION

The plaintiff CHRYSTOPHER S. LEE #176385 has been incarcerated at NOTTOWAY CORRECTIONAL CENTER, since 1998. Nottoway Correctional Center, P.O. Box 488 Burkeville, VA 23922.

## CONSENT

Pursuant to 28 U.S.C. section 636 (c), the plaintiff consents to proceed before a U.S. Magistrate Judge and have him preside over this matter, while retaining his right to appeal to the U.S. Court of Appeals For the Fourth Circuit.

Pursuant to 28 U.S.C. Section 1746, I certify under penalty of perjury that the foregoing is true and correct. Signed and affirmed this 28th day of FEB, 2008.

                                                                                  _____
                                                                                  CHRYSTOPHER S. LEE #176385
                                                                                  Plaintiff
                                                                                  Pro se,

Sworn before Me this

28 day of Jan, 2008

_____
Notary Public

John E. Meacom
Commonwealth of Virginia
Notary Public
Commission No. 157448
My Commission Expires 09/30/2011

I CHRYSTOPHER S. LEE Certify that the above Notary is not a party of this action.

                                                                                  _____
                                                                                  CHRYSTOPHER S. LEE #176385