IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CHRYSTOPHER LEE, #1011188,

    Plaintiff,

v.                                              CIVIL ACTION NO. 3:08-cv-99

PATRICK GURNEY, et al.,

    Defendants.

**REVISED BRIEF IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

    Defendants Patrick Gurney, G. K. Washington and Douglas M. Vaughan, by counsel, herein submit their Revised Brief in Support of Motion for Summary Judgment as directed in the Court's June 1, 2010, Memorandum Order. This Revised Brief is submitted in support of the Motion for Summary Judgment filed April 19, 2010.

    1.    The Plaintiff in this proceeding is Virginia Department of Corrections ("VDOC") inmate Chrystopher Lee, #1011188 ("Lee"). Lee prosecutes this action under the provisions of 42 U.S.C. § 1983 and the Religious Land Use And Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a)(1)-(2). Defendants Gurney and Washington previously moved this Court for summary judgment, and on September 24, 2009, this Court entered its Memorandum Opinion (attached) granting in part, and denying in part, that Motion. The Memorandum Opinion at pages 1-2 identifies four claims Lee presents in his Complaint. The Court granted Defendants Gurney and Washington summary judgment on Claim One (equal protection) and Claim Two (religious exercise/First Amendment).

2.      The Court's Memorandum Opinion at page 2, note 7 indicates that Defendants Gurney and Washington failed to address Plaintiff's Claim Three, which is that he suffered a Due Process Clause violation "when they forced him to pray in a manner contrary to his religious beliefs."  The Court accordingly could not grant summary judgment on Claim Three.  The Court further denied summary judgment to Defendants Gurney and Washington on Lee's Claim Four, which he brings under RLUIPA.  Claim Four, which is factually identical to Claim Two, challenges a prison ban on group prayer in the recreation yard.

3.      Lee identifies himself as a leader of the Sunni Muslim Community at the Nottoway Correctional Center ("Nottoway").[1]  Lee's Compliant is fairly simple.  He claims that a prohibition on group activities, to include group prayer activities, on the prison recreation yard violates his legal rights.  In particular, he says that the prohibition works a restriction on his ability to engage in congregate prayer as his religion dictates he should, and that this restriction on his religious exercise violates his constitutional rights under the Free Exercise Clause and also violates the free exercise rights guaranteed him by the Religious Land Use And Institutionalized Persons Act ("RLUIPA").  Lee has a third claim that the congregate prayer restriction violates due process protections.  Lee's fourth claim contends that the challenged prohibition violates the Equal Protection Clause of the Fourteenth Amendment.

4.      The Defendants first note that there may be some question as to whether Lee is attempting to litigate this action on behalf of "World Wide Sunni (Muslim) Community At Nottoway Correctional Center."  To the extent that his action might be interpreted as an effort on Lee's part to represent the entire Muslim community, or possibly as a class action, the rule of law in the Fourth Circuit is that a pro se prisoner may only represent himself.  See Oxendine v. Williams, 509 F.2d 1404, 1407 (4th Cir. 1975).

---

[1] Lee has been transferred to Sussex I State Prison ("Sussex I") during the pendency of this action.

5.     Defendants present as Exhibit I, the affidavit of Harris L. Diggs, Warden of Nottoway Correctional Center ("Nottoway"); as Exhibit II, the affidavit of Defendant Vaughan, former Nottoway Warden; and as Exhibit III, the affidavit of John Jabe, VDOC Deputy Director, and respectfully request the Court to consider the same as evidence in support of this Motion. Additionally, Defendants Gurney and Washington join in this Motion for the purpose of requesting the Court to reconsider whether, based on the additional affidavit evidence presently being presented, all three Defendants should be granted summary judgment with respect to Lee's RLUIPA claim.

6.     The Court's Memorandum Opinion at pages 10-13 discusses Lee's RLUIPA claim and why summary judgment could not be granted to Defendants Gurney and Washington. The first prong of the RLUIPA test asks whether a prison's practice or policy imposes a substantial burden on an inmate's religious exercise. If a substantial burden has been imposed, then prison officials must demonstrate: (1) the burden furthers a compelling governmental interest, and (2) the burden represents the least restrictive means of furthering that compelling governmental interest. (Memorandum Opinion, p. 10).[2]

7.     The Court first expresses its concern whether Defendants Gurney and Washington adequately demonstrated that a policy barring any congregate activity on the prison yard furthers a compelling state interest. The Court then continues in its analysis to find that Defendants Gurney and Washington have not, for summary judgment purposes, adequately demonstrated

---

[2] Defendants Gurney and Washington recognize, as does Defendant Vaughan, that Lee's allegations about a need to engage in congregate prayer is not an assertion that can be decided adversely to Lee at the summary judgment stage. The Court's Memorandum Opinion at pages 3-4 identifies what it is that Lee says his religion requires. Lee claims that he has to perform a prayer five times per day. More germane to the inquiry about congregate prayer on the prison's recreation yard is Lee's further claim that when he is gathered with two or more other believers at the time the prayer is required, then the group of them must make their prayer together. (Memorandum Opinion, p. 3). Putting together these various points, one is left to conclude that if Lee is on the recreation yard at 4:06 a.m., 1:09 p.m., 5:13 p.m., 8:27 p.m. or 9:29 p.m., and a fellow believer, or fellow believers, also is present on the recreation yard with him, then they all must be able to pray together.

that prison officials cannot make an allowance for the congregate prayer activities that Lee wants. Thus the Court concludes, again for summary judgment purposes, that Defendants Gurney and Washington failed to demonstrate that a flat prohibition on congregate activity, without exception for religious prayers, would be the least restrictive means to further a compelling governmental interest. (Memorandum Opinion, pp. 12-13).

8. When Lee challenged the prohibition on congregate activity on the recreation yard, then Warden Vaughn advised him that VDOC policy required "in-room" supervision of religious activities. Vaughn also advised Lee that the institution reserved the ability to limit, restrict, discontinue or deny some religious activities based upon security, safety, facility order, space or resources concerns. (Exh. I, ¶ 5).

9. Warden Diggs explains that the staff at Nottoway has to provide adequate and appropriate space and time for religious worship for all recognized religious faith groups on as equitable a basis as is possible. The Sunni Muslims meet weekly on Mondays and Wednesdays from 4:45 p.m. to 6:45 p.m., and the Jumah Prayer is held every Friday from 12:45 p.m. to 1:45 p.m. Warden Diggs further advises that no preference is given to an activity of any particular religious denomination, faith or sect. (Exh. I, ¶ 7).

10. No inmates from any religious denomination are permitted to gather for group prayer unless it is during their scheduled meeting time with appropriate supervision. During the supervised group meetings, an adequate amount of staff is made available to maintain control and order. During religious meetings there may be as many as 80 inmates who participate, and during recreation activities there may be as many as 165 inmates on the yard at any given time. When the inmates are required to have their group meetings in a room setting, they can be more confined and easily maintained. Inmates out on the recreation yard are able to spread out and

cause numerous distractions that security staff may not be able to address due to the sheer size of the recreation yard. Inmates out on the yard may claim to be gathering for religious reasons, but could in fact be planning disruptive or illegal activities. No inmate gatherings are permitted on the recreation yard, and must be prevented in order to maintain a secure institution. (Exh. I, ¶ 8).

11.   Warden Vaughan retired from the VDOC in October, 2008, though he was the Warden at Nottoway Correctional Center when Lee contends a policy was implemented that eliminated a previously existing ability to engage in congregate prayer activity on the prison's recreation yard. (Exh. II, ¶ 1). Warden Vaughan first notes that during the many years he worked at Nottoway, no offenders of any religious denomination were permitted to participate in group prayer on the recreation yard. He says that he made no changes to a policy that was already in place. To his knowledge, this is the process at all institutions within the VDOC. (Exh. II, ¶ 4).

12.   Vaughan then explains that the recreation yard at Nottoway normally will have a patrol officer who patrols the entire yard and monitors inmate activity. Additionally, activity on the recreation yard can be monitored from a distance by tower officers and a roving patrol officer. Warden Vaughan states his professional opinion that this degree of supervision is not sufficient for group gatherings on the recreational yard, primarily because the patrol officer cannot remain stationary, and he would have to be stationary in order to monitor what a group of offenders were communicating among themselves. The tower officers and the roving patrol officer have sight supervision only, and they cannot monitor verbal exchanges of groups gathered on the yard. Without being able to monitor communications, prison officials cannot control inappropriate communications that may have a negative impact on facility operations. (Exh. II, ¶ 5).

13. Vaughan further explains that group gatherings additionally allow for the easy exchange of contraband from one offender to another. In his opinion, to pull security officers from other posts in order to add additional security to the recreation yard, which is what would be needed in the event of group gatherings, would compromise security at the rest of the facility. Pulling officers for the purpose of monitoring yard activities would adversely impact the scheduled activities throughout the rest of the institution. An area or areas from which officers might be pulled would reduce a facility's ability to monitor the areas where the security presence had been reduced. In some cases, other programming might have to be cancelled if staff members were reassigned to provide security on the recreation yard. (Exh. II, ¶ 6).

14. Vaughan continues on to explain that no offenders from any religious denomination can gather for group prayers unless it is during a scheduled meeting time, with appropriate supervision. Sunni Muslims, which Lee says that he is, meet weekly on Mondays and Wednesdays for two hours. Additionally, there is a Jumah Prayer held every Friday during the afternoon. Vaughan denies giving preference to any activity of one religious denomination, faith or sect over another. (Exh. II, ¶ 7).

15. Affiant John Jabe is the Deputy Director for the VDOC. He has submitted his own affidavit to express Departmental concerns from the overall standpoint of the agency. Jabe explains that any time inmates can gather in groups there is an opportunity for them to plot activities that can threaten other prisoners, correctional staff and institutional security generally. The agency attempts to have a security officer closely monitor any group gatherings to help ensure that inmates are not planning illicit activities such as: attacks on other inmates or staff; group demonstrations; betting or bartering activities; escapes; or any other activities that would present clear and direct threats to the institution's orderly operations. (Exh. III, ¶ 4).

16.     Jabe points out that prison officials simply can never assume that gatherings purportedly for religious activities are benign.  He states that prisoners can use the occasion of alleged religious activity to engage, or hatch plans to engage, in illicit activities.  Even where some of the gathered prisoners may have pure religious motives, some members in a gathering may not be there for religious reasons, but in order to try and take advantage of what outwardly looks like it should be a positive experience.  Jabe notes that the agency has had the very real experience where, during a group religious activity, an inmate was murdered.[3]  (Exh. III, ¶ 5).

17.     Jabe points out that all prisoner gatherings, including religious gatherings, are scheduled events where the prisoners have a particular time and place that they can meet. Security personnel are assigned to monitor the gatherings, whether religious or otherwise. Inmates simply cannot be permitted to dictate the timing and place of the group gatherings.  Jabe points out that in addition to what he believes are obvious security concerns with inmate group gatherings, there is also the potential issue of other inmates seeing special privileges being afforded one group of inmates, and then insisting on some compensating privileges for themselves.  Worse yet, an inmate or inmates observing another prisoner or group of prisoners getting preferential treatment may decide to act out against the person or group members that prisoner perceives as having been afforded special privileges. (Exh. III, ¶ 6).

18.     Jabe also addresses the question why a prison such as Nottoway cannot simply allocate additional security personnel in order to monitor religious activities on the recreation yard.  Jabe points out that the scheduling of meetings for specific times and at specific places allows prison administrators to plan for the institution's manpower needs, assuring that security personnel are allocated throughout the institution.  Any prison is only allocated a certain number

---

[3] The details of this prisoner murder during a group religious activity can be found at the Virginia Supreme Court's Opinion in Remington v. Commonwealth, 262 Va. 333, 551 S.E.2d 620, cert. denied, 535 U.S. 1062 (2002).

7

of officers, and this allocation addresses the number of staff members needed for that facility's different post positions.  Reallocation of personnel to monitor group gatherings where the inmates are the ones dictating the time and place of assembly seriously interferes with normal staffing patterns.  Virginia and the VDOC have been experiencing severe budgetary shortfalls for some time now, necessitating the closings of multiple prisons with many employees losing their jobs.  The agency simply is not in the financial position to create new security posts that might accommodate inmate desires, religious or otherwise, to have their own gatherings outside the times and places that are planned for inmate group gatherings.  (Exh. III, ¶ 7).

  19. An examination of Lee's First Amendment claim requires the Court to apply the four factor test set out in the Supreme Court's opinion in <u>Turner v. Safley</u>, 482 U.S. 78 (1987).  The four factors that the <u>Turner</u> case identified include:  (1) whether there is a valid rational connection between the prison regulation and the government's asserted interest, in this case security; (2) whether the prisoner retains alternative means to exercise the religious right he says has been denied him; (3) what impact any accommodation might have on security staff, inmates and the allocation of scarce prison resources; and (4) whether there are obvious, easy alternatives to the challenged action such that the court might conclude that the challenged action is actually an exaggerated response to the asserted need, again in this case the need being security.  <u>Lovelace</u>, 472 F.3d at 200.

  20. The need to restrict group gatherings in the prison setting to those occasions where appropriate supervision can be maintained is self-evident.  Certainly there is a rational connection between the need to provide appropriate supervision over inmates and a regulation which restricts group gatherings on a prison's recreation yard.  Warden Diggs points out in his affidavit that the Sunni Muslim population has approved times and places for group gatherings,

to include the right to observe the Friday Jumah Prayer.  To allow group gatherings on the recreation yard would require the hiring of additional security personnel, in order that closer supervision might be provided.  Obviously the hiring of more personnel would place a strain on prison budgetary concerns.  Finally, there does not appear to be any obvious, easy alternative to the prohibition of group gatherings on the recreation yard.  The prohibition on recreation yard group gatherings passes muster under the Turner v. Safley test.

21.     The protections of the RLUIPA, however, impose a more rigorous judicial review standard of inmate religious exercise claims than does the "reasonableness" test set forth in Turner.  The RLUIPA provides that a government may not impose a substantial burden on a prisoner's religious exercise unless the challenged action furthers a compelling governmental interest and does so by the least restrictive means.  42 U.S.C. § 2000cc-1(a).  The prisoner in this case has articulated a religious exercise that is substantially burdened by the prohibition of group activities on the recreation yard.  The government defendants then must demonstrate the existence of a compelling governmental interest, and that the challenged practice is the least restrictive means available to further that interest.

22.     The Court's Memorandum Opinion sets out the RLUIPA legal analysis that applies to the factual issues presented in this lawsuit.  Defendants must demonstrate that the ban on congregate activity on the recreation yard "is the least restrictive means of furthering a compelling governmental interest." (Memorandum Opinion at p. 10).  The Court owes deference to the prison authorities in their determination of security concerns.  Cutter v. Wilkerson, 544 U.S. 709, 722-723 (2005).  Thus for Defendants to prevail under RLUIPA, the Court must conclude that:  (1) close monitoring of prisoner group activities furthers the compelling governmental interest in prison security; and (2) limiting prisoner group gatherings to scheduled

places and times where close monitoring is possible is the least restrictive alternative to further the security interest.

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, see supra, at 5, "context matters" in the application of that standard. [Citation omitted]. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. [Citation omitted]. They anticipated that courts would apply the Act's standard "with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." [Citation omitted].

Id.

See also Hoevenaar v. Lavaroff, 422 F.3d 366, 371 (6th Cir. 2005) (noting that judicial deference standard applies both to determination of the existence of security interests, and also to whether a policy or regulation is the least restrictive means available to address that interest.).

23. These Defendants, as well as Deputy Director Jabe, believe that the Court will readily understand that congregate inmate activity presents a clear potential for security breaches, unless that activity can be closely monitored. Recognizing that at least in theory a security officer could be assigned to monitor group gatherings on the recreation yard, and in particular group gatherings where the inmates represent they are engaging in religious activity, former Warden Vaughan and Deputy Director Jabe explain why the allocation of special security monitors simply is not feasible. Budgetary concerns, such as have been displayed throughout the various news media outlets over many, many months, will not allow for the creation of new security posts such as would be necessary for monitoring congregate yard activities. Pulling security officers from other posts is no answer either. To begin with, Lee himself cannot say just when it is that he and another inmate or inmates of his own religious persuasion will find

themselves on the prison yard at a time when prayer activity is necessitated by their religious beliefs. Thus, there would not appear to be any way that prison officials could possibly plan for when it is that additional security would be needed on the yard. In any event, prison officials do not have the luxury of pulling security officers off of other posts unless they want to compromise security in other areas of the institution. The complete banning of congregate activity on the prison yard, whatever the intent of the gathering might be, is the least restrictive means that prison officials have to further their compelling governmental interest in not allowing group gatherings without appropriate staff supervision.

24. The Court has already determined that Lee has not demonstrated any differential treatment that resulted from intentional or purposeful discrimination. (Memorandum Opinion at p. 6). The equal protection claim has been dismissed as to Defendants Gurney and Washington, and should also be dismissed as to Defendant Vaughan.

25. That leaves then for the Court to address the question whether Lee has presented a due process claim. His claim appears at ¶ 38 of his Complaint where he says that he has been deprived of a protected liberty interest. Citing Sandin v. Conner, 515 U.S. 472, 477-78 (1995). In other words, it seems that Lee's contention is that whereas he formerly could engage in congregate prayer activity, there came a point in time where that privilege was removed. He contends that since he utilized the privilege for religious exercise, the privilege actually protected a liberty interest and could only be removed with the protection of due process. These Defendants believe that Lee is wrong in his legal analysis.

26. The Defendants first note that, according to former Warden Vaughan, Lee's contention that there was a point in time when he freely could engage in congregate prayer activity on the recreation yard is simply incorrect. The policy, per former Warden Vaughan, has

always been to prohibit any type of congregate activity on the prison yard. If in fact Lee was periodically engaging in group activities on the yard, he did so contrary to prison policy. In any event, Lee would have to demonstrate under <u>Sandin</u> that the prohibition of group activity imposed an atypical condition of confinement upon him. The atypical condition of confinement test is what the <u>Sandin</u> court says must apply to determine whether there is a due process interest on the part of the inmate. Where all inmates within the prison are similarly prohibited from engaging in congregate activity on the prison's recreation yard, Lee scarcely can be heard to contend that enforcement of the policy imposed upon him an atypical condition of confinement. Accordingly, the Defendants argue that the due process claim that Lee posits must be rejected under <u>Sandin</u>'s atypical conditions of confinement test.

Accordingly, for the reasons stated herein, all Defendants respectfully request the Court to enter its order dismissing this lawsuit.

27. In accordance with Local Rule 7(K), Plaintiff is directed to read the attached Notice.

28. In accordance with Local Rule 56(B), the following is a list of undisputed facts:

## STATEMENT OF UNDISPUTED FACTS

A. Plaintiff Chrystopher Lee ("Lee") was at all pertinent times an inmate at the Virginia Department of Corrections Nottoway Correctional Center. (Complaint).

B. Inmate Lee professes a need to engage in congregate prayer activity multiple times daily. The general times are 4:06 a.m., 1:09 p.m., 5:13 p.m., 8:27 p.m., and 9:27 p.m. One way in which he is able to satisfy this need is to engage in prayer activities on the prison's recreation yard with other Sunni Muslim inmates. (Memorandum Opinion at p. 3).

C. The prison, however, has a policy that restricts religious group gatherings to room settings where appropriate supervision can be provided. (Exh. I, ¶ 8).

D. No group activities of any nature are allowed on the prison yard due to an inadequate number of personnel being available to provide appropriate supervision. (Exh. I, ¶ 8).

E. Inadequately supervised group gatherings of inmates presents prison officials with concern over safety issues. (Exh. I, ¶ 8).

F. Sunni Muslims, including inmate Lee, have other means available to them to practice their religious beliefs. (Exh. I, ¶ 7).

G. Inmate group activities are closely regulated as to time and place. Corrections personnel are required to monitor group activities so as to prevent a gathering of inmates from engaging in any illicit activities. Among the illicit activities that prison officials have found to be enabled by group gatherings are the passing of contraband items and verbal planning of activities that can jeopardize prison security, to include assaultive conduct; prisoner demonstrations; and escape efforts. (Exh. II, ¶¶ 5-6; Exh. III, ¶¶ 4-5).

H. Prison officials cannot simply assume that a group of inmates gathering for stated religious activities will limit their group meetings to benign conduct. There is the actual experience of one inmate murdering another during a group religious activity. There is also concern that inmates gathered in the group will not be gathered for religious activity, but will instead use the occasion to discuss, or engage in, activities detrimental to prison security. There is even concern that those who gather for a religious exercise will take the occasion to extend the

13

   reason for the gathering beyond religious exercise in order to discuss, or engage in, activities detrimental to prison security.  (Exh. III, ¶ 5).

I.  The only way to address these concerns is to monitor all group activities.  At Nottoway, the level of security presently available to monitor recreation yard activities is not enough to allow close monitoring of group gatherings on the yard.  Pulling security personnel from other posts would reduce the level of security available in the areas monitored by those posts, and could require scaling back or eliminating other prisoner activities.  Commonwealth of Virginia and VDOC budgetary constraints preclude the creation of a security post or posts that would allow for close monitoring of group prisoner activities on the recreation yard.  (Exh. II, ¶ 6; Exh. III, ¶ 7).

         Respectfully submitted,

         PATRICK GURNEY,  G. K. WASHINGTON
         & DOUGLAS M. VAUGHAN


         By   /s/
         Mark R. Davis, SAAG, VSB #18830
         Attorney for Defendants
         Office of the Attorney General
         Public Safety & Enforcement Division
         900 East Main Street
         Richmond, Virginia 23219
         (804) 786-5631
         (804) 786-4239 (Fax)
         mark.davis@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of June, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:  N/A

And I hereby certify that I have mailed the document by United States mail to the following non-filing user:

>Chrystopher Lee, #1011188
>Sussex I State Prison
>24414 Musselwhite Drive
>Waverly, Virginia 23891-1111

>                     /s/
>Mark R. Davis, SAAG, VSB #18830
>Attorney for Defendants
>Office of the Attorney General
>Public Safety & Enforcement Division
>900 East Main Street
>Richmond, Virginia 23219
>(804) 786-5631
>(804) 786-4239 (Fax)
>wdavis@oag.state.va.us