# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

CHRYSTOPHER LEE,

      Plaintiff,

v.                                                  Civil Action No. **3:08cv99**

PATRICK GURNEY, *et al.*,

      Defendants.

## MEMORANDUM OPINION

Plaintiff, a Muslim inmate initially proceeding *pro se*, filed this action alleging that Defendants Gurney, Vaughan, and Washington (collectively "Defendants") violated his rights by not allowing him to engage in group prayer in the prison recreation yard at Nottoway Correctional Center ("NCC").[1] The matter is before the Court on the motion for summary judgment filed by Defendants.

## I. PROCEDURAL HISTORY

Specifically, Plaintiff contends:

Claim One      Defendants violated Plaintiff's rights under the Equal Protection Clause[2] by promulgating and enforcing a ban on group prayer in the recreation yard which "purposefully singles out religious practices observed only [by] Sunni adherents." (Compl. ¶ 35.)[3]

---

[1] The parties have used various spellings for Defendant Vaughan's last name. According to Vaughan's affidavit, his name is spelled as reflected above. (Defs.' Revised Br. in Supp. of Mot. for Summ. J. ("Defs.' Br.") Ex. II ("Vaughan Aff.").)

[2] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

[3] The Court's citations to Plaintiff's complaint reference the numbered paragraphs in the "STATEMENT of THE CLAIM" and "ESTABLISHMENT OF THE CLAIM" sections of Plaintiff's complaint.

| Claim Two | Defendants Vaughn and Washington violated Plaintiff's rights under the First Amendment when they prohibited him from engaging in any group prayer on the prison recreation yard.[4] |
|---|---|
| Claim Three | Defendants violated Petitioner's rights under the Due Process Clause[5] when they forced him to pray in a manner contrary to his religious beliefs. |
| Claim Four | Defendants violated Plaintiff's rights under the Religious Land Use and Institutionalized Person's Act[6] ("RLUIPA") by promulgating and enforcing a ban on group prayer in the recreation yard. |

By Memorandum Opinion and Order entered on September 25, 2009, the Court granted Defendants Gurney and Washington's motion for summary judgment with respect to Claims One and Two and denied their motion with respect to Claim Four. Thereafter, the Court served Defendant Vaughan.

On April 19, 2010, Defendants Gurney, Washington, and Vaughan moved summary judgment with respect to all the remaining claims. On April 27, 2010, Plaintiff was transferred to Sussex I State Prison ("Sussex I"). By Memorandum Order entered on June 1, 2010, the Court directed the parties to brief whether Plaintiff was entitled to monetary damages under RLUIPA and whether Plaintiff's claims had been rendered moot by his transfer from NCC. The parties responded to the June 1, 2010 Memorandum Order.

On July 16, 2010, the Court informed the parties that it would treat Defendants' arguments with respect to mootness and damages as an expansion of Defendants' motion for

---

[4] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const. amend. I.

[5] "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ." U.S. Const. amend. XIV, § 1.

[6] 42 U.S.C. § 2000cc-1(a)(1)-(2).

2

summary judgment and offered Plaintiff a further opportunity to respond to the expanded motion for summary judgment. Plaintiff did not file any additional response.[7] These matters are ripe for disposition.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting* former Fed. R. Civ. P. 56(c) and 56(e) (1986)). In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Nevertheless, the nonmoving party cannot "'create a genuine issue of material fact

---

[7] Although counsel for Plaintiff moved to continue the evidentiary hearing, which had been scheduled for December 7, 2010, counsel for Plaintiff has not submitted briefing or evidence with respect to the pending motion for summary judgment.

3

through mere speculation or the building of one inference upon another.'" *Emmett v. Johnson*, 532 F.3d 291, 296 (4th Cir. 2008) (*quoting Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985)).

In support of their motion for summary judgment, Defendants have submitted affidavits from: Harris L. Diggs, the current Warden of NCC; Douglas Vaughan, the former Warden of NCC; John Jabe, the Deputy Director of the Virginia Department of Corrections ("VDOC"); Gary Bass, the Chief of Operations of Offender Management Services for the VDOC; G.K. Washington, Regional Director of the Central Region of the VDOC; and Patrick Gurney, who is currently the Assistant Warden of Haynesville Correctional Center. In opposition to the motion for summary judgment, Plaintiff offers his verified complaint, his own sworn statements, and affidavits from inmates Kevin Ridgley and Jason A. Morant. In light of the foregoing submissions, the facts set forth below are presumed true for purposes of the motion for summary judgment.

### III. SUMMARY OF PERTINENT FACTS

#### A. Salat at NCC

As a Sunni Muslim, Plaintiff is obliged to perform the Salat, "Prayer for Forgiveness," five times per day. (Compl. ¶ 3.) The general time frame for these five obligatory prayers is as follows: 4:06 a.m., 1:09 p.m., 5:13 p.m., 8:27 p.m., and 9:27 p.m. (Compl. ¶ 6.) Plaintiff's religion requires that "when two or more Sunni's [sic] are together at prayer time they are to pray or make Salat together." (Ridgley Aff. Supp. Pl.'s Resp. Opp'n Summ. J. ("Ridgley Aff.") ¶ 4.)[8] During his incarceration at NCC, Plaintiff "participated in and/or led Group Prayer (two or more

---

[8] The Court has corrected the capitalization in Plaintiff's submissions and those of his fellow inmates.

participants) on both recreation yards without interrupting or distracting normal recreational activities from his arrival in 1998 through 2007." (Compl. ¶ 2.) On May 13, 2007, after leading four inmates in prayer, Plaintiff was called to the watch commander's office and informed that he could no longer lead or participate in group Salat on the recreation yard. (Compl. ¶ 7.) Plaintiff filed a grievance challenging this restriction. (Compl. ¶ 10.) On June 27, 2007, Defendant Vaughan, the former Warden of NCC, responded to Plaintiff's grievance. (Defs.' Br. Ex. I ("Diggs Aff.") Encl. B.) Defendant Vaughan informed Plaintiff that, pursuant to the "new policy" set forth in DOP § 841.3, Plaintiff could not engage in group prayer on the recreation yard.[9] (Diggs Aff. Encl. B.) Plaintiff appealed. On July 17, 2007, Defendant Washington upheld Defendant Vaughan's decision. (Diggs Aff. Encl. B.)

Defendant Vaughan, who retired in October of 2008, explains that contrary to his remark in response to Plaintiff's grievance, his decision was not based upon any new policy.[10]

---

[9] The pertinent provision of DOP § 841.3 provides:

6.  Religious services and group activities shall be visually observed as indicated below, and accommodations for religious programs shall be in accordance with requirements concerning a facility's security level, safety of the offender population, and orderly operations.
    a.  Security Level 4 and Security Level 5 facilities shall have in-room DOC staff supervision at all times, whether or not volunteers are present.

(Diggs Aff. Encl. A § IV, A.6.)

[10] Vaughan's affidavit was not part of the record when the Court concluded that Defendants' decision to prohibit group Salat at the recreation yard at NCC was driven by the promulgation of the new policy set forth in DOP § 841.3. *See Lee v. Gurney*, No. 3:08cv99, 2009 WL 3109850, at *2-3 (E.D. Va. Sept. 25, 2009).

I worked at Nottoway for twenty four years. In all my years at Nottoway, no offenders of any religious denomination were permitted to participate in group prayer on the recreation yard. I made no changes to the policy that was already in place. . . .

. . . .

No offenders from any religious denomination are permitted to gather for group prayer unless it is during their scheduled meeting time, and with appropriate supervision. . . .

I did not make any changes in policy at Nottoway regarding group prayer on the recreation yard. Gathering of offenders on the recreation yard was never permitted during my tenure.

(Vaughan Aff. ¶¶ 4, 7, 8.)[11] Diggs, the current Warden of DCC, states that he continues to maintain a policy against permitting group worship on the recreation yard.

No inmates from any religious denomination are permitted to gather for group prayer unless it is during their scheduled meeting time with the appropriate supervision. Inmates are appropriately supervised during regularly scheduled religious meetings.

(Diggs Aff. ¶ 8.)

At NCC, the VDOC staff provide in-room opportunities for religious meetings for Sunni Muslims every week, on Mondays and Wednesdays from 4:45 p.m. to 6:45 p.m. (Diggs Aff. ¶ 7.) Additionally, the VDOC staff provides supervision for Jumah, a weekly prayer, every Friday from 12:45 p.m. until 1:45 p.m. (Diggs Aff. ¶ 7.) During these and all other inmate religious meetings, which may include up to 80 inmates, prison staff are assigned to the room to maintain control and order. (Diggs Aff. ¶ 8.)

---

[11] Defendant Vaughan represents that all institutions within the VDOC also follow the practice of prohibiting group prayer on the recreation yard. (Vaughan Aff. ¶ 4 ("To my knowledge this is the practice of all institutions within the VDOC.").) Vaughan's affidavit, however, does not contain facts that suggest, since his retirement from the VDOC in October of 2008, he is competent to testify as to what is occurring at other prisons within the VDOC. *See* Fed. R. Civ. P. 56(e)(1).

During recreation periods, prison staff must supervise up to 165 inmates on the recreation yard. (Diggs Aff. ¶ 8.) Warden Diggs explains that guards cannot effectively supervise gathering of inmates on the recreation yard:

> When inmates are on the recreation yard they are able to spread out and cause numerous distractions which security staff may not be able to address appropriately due to the sheer size of the recreation yard. Also, inmates may claim to be gathering for religious reasons, but could in fact be planning a riot or participating in gang related activities. Security staff may not be able to identify what is happening before an incident occurs and this could cause a safety issue for other inmates and staff on the recreation yard. Gatherings of inmates on the recreation yard are never permitted and must be prevented in order to maintain a secure institution.

(Diggs Aff. ¶ 8.) Deputy Director Jabe insists that the VDOC cannot "assume that gatherings for religious activities are benign." (Defs.' Br. Ex. III ("Jabe Aff.") ¶ 5.) Jabe explains, "[W]e have had the very real experience of a group religious activity resulting in the murder of an inmate at the religious gathering. This was the case at Augusta Correctional Center when inmates participating in a group religious (Asatru) gathering stabbed another inmate to death." (Jabe Aff. ¶ 5.) Jabe concludes permitting group Salat on a recreation yard would compromise institutional security "[u]nless prison officials have enough manpower to provide direct supervision over [the] group gathering." (Jabe Aff. ¶ 3.)

Former Warden Vaughan insists that NCC does not have sufficient to staff to adequately monitor group prayer on the recreation yard.

> The recreation yard at Nottoway normally has a patrol officer assigned to patrol the entire recreation yard and monitor the activity of the offenders. Also, the recreation yard is monitored from a distance by tower officers and a roving patrol officer. This amount of supervision is not sufficient for group gatherings on the recreation yard, because the patrol officer can not remain stationary, as he would have to be in order to monitor the dialog of a group of offenders. The tower officers and roving patrol officer have sight supervision only, and can not monitor the verbal exchange of the offenders if they are gathered in a group. Without audible

7

monitoring there is no way to control inappropriate communications that may have a negative impact on the secure operations of the facility. Offenders can plan riots, attacks on officers or other offenders whenever they are allowed to gather in groups, unless they can be closely monitored.

(Vaughan Aff. ¶ 5.)

According to Warden Diggs, when "inmates are required to meet in a[n] 'in room' setting they are more confined and easily maintained." (Diggs Aff. ¶ 8.) Additionally, requiring inmate religious gatherings to occur at specific times and places "allows prison administrators to plan for the institution's manpower needs, assuring that security personnel are allocated throughout the institution." (Jabe Aff. ¶ 7.) Deputy Director Jabe explains that staffing concerns and severe budgetary restraints preclude the allocation of additional staff to monitor group religious activity on the NCC recreation yard:

> Any prison is only allocated officers as specified by the established Full Time Employee (FTE). This allocation addresses the number of staff members needed for the facility's different post positions. Reallocation of available personnel to monitor group gatherings where the inmates dictate the time and place of assembly seriously interferes with the institution's normal staffing patterns. Virginia and the VDOC have been experiencing severe budgetary shortfalls for some time now, necessitating the closings of multiple prisons with many employees losing their jobs. We simply are not in a financial position to create new security posts that might accommodate inmate desires - religious or otherwise - to have their own gatherings outside the times and places that are planned for inmate group gatherings.

(Jabe Aff. ¶ 7.)

### B. Plaintiff's Evidence that Defendants' Security Concerns Are Exaggerated

Although Plaintiff was told that he could not participate in group Salat, the remaining Sunni Muslins at NCC were allowed to continue to engage in group Salat. (Ridgley Aff. ¶¶ 3, 4;

Morant Aff. Supp. Pl.'s Resp. Opp'n Summ. J. ("Morant Aff.") ¶¶ 4, 5.)[12]  According to inmate

Ridgley:

> I arrived at NCC in 2004 and have continuo[u]sly to this date made group Salat with all but one of my Sunni Muslim brothers on both rec. yards without incident or interference from any NCC staff or prison administrators.
>
> To my knowledge the plaintiff is the only Sunni Muslim at NCC be called to the watch office for making group salat and then prohibited from participating in group salat again. Since his prohibition, when the rest of us made group Salat the plaintiff remained at least 50 yards away from us and made his own individual Salat.

(Ridgley Aff. ¶¶ 3, 4.)  Inmate Morant also states that no inmate at NCC, other than Plaintiff, has

been prohibited from engaging in group Salat.

> I have been at the NCC since August of 2001, and during my entire residence here I have personally observed Sunni Muslims making group Salat prayers on both NCC rec. yards. This practice continues, even upto [sic] today - uninhibited by NCC in any way.
>
> As fact, the only Sunni Muslim that I know at NCC who has been stopped from participating in group Salat at NCC, is the plaintiff Chrystopher Lee. Nobody else has stopped or was ever directed to stop participating in group Salat.

(Morant Aff. ¶¶ 4, 5.)  Neither Plaintiff nor inmate Ridgley have observed any incidents of unrest

because of the group Salat.  (Compl. ¶ 23; Ridgley Aff. ¶ 3.)  There are only two to six Sunni

Muslim adherents who wish to engage in group Salat on the recreation yard at any given time.

(Compl. ¶ 23.)  The group Salat lasts less than ten minutes.  (Compl. ¶ 23.)  The VDOC already

permits numerous other group sporting activities on the recreation yard, including basketball,

softball, soccer, and volleyball.  (Ridgley Aff. ¶ 8.)

---

[12] At the time the Court entered the September 24, 2009 Memorandum Opinion and Order, Plaintiff had not submitted any evidence indicating that he was the only inmate not allowed to engage in group Salat.

**C.** **Restrictions on Group Salat at Sussex I**

On April 27, 2010, Plaintiff was transferred from NCC to Sussex I State Prison ("Sussex I"). The Court directed Plaintiff to show cause why his claim for injunctive relief was not rendered moot by his transfer. Plaintiff asserts that "due to the defendants['] assertions, the plaintiff faces the same eminent [sic] threat of punishment for engaging in group Salat on the rec. yard at Sussex I as he did at NCC." (Pl.'s Br. Supp. Monetary Damages 3.)[13] The record, however, reflects that Defendants Gurney, Washington, and Vaughan do not have authority over Sussex I or the interpretation and enforcement of DOP § 841.3 at that facility. (Defs.' Resp. Court's June 1, 2010 Mem. Order Re. Injunctive Relief, Gurney Aff. ¶ 3, Washington Aff. ¶ 3.) Furthermore, Plaintiff has not submitted any evidence indicating that he is not engaging in group Salat at Sussex I. Nor did Plaintiff submit any evidence indicating that, since his transfer, prison officials at Sussex I have told him that he could not engage in group Salat at Sussex I.[14] Additionally, inmate Ridgley states that prior to arriving at NCC in 2004, he was incarcerated at Sussex I and engaged in group Salat on the Sussex I recreation yards without any interference from prison officials. (Ridgley Aff. ¶ 3.)

---

[13] Plaintiff's evidence regarding the conditions at Sussex I is not set forth in an affidavit, but rather in a memorandum of law, the entire contents of which he has sworn to be true. Perhaps an even greater contributor to the ambiguity of Plaintiff's evidence is that the sworn statement was written by inmate Morant, who is incarcerated at NCC. Morant apparently pens all of Plaintiff's memoranda and sworn statements and then transmits them to Plaintiff who signs off on them. (Morant Aff. ¶ 1 ("I am the strategist and author of all filings submitted by Chrystopher Lee upto [sic] 4/27/10 in the above styled case.").) The handwriting on Plaintiff's recent submissions indicates that Morant continues to draft Plaintiff's submissions.

[14] Indeed, in Plaintiff's response to the Court's show cause order, he speaks of his injury in the past tense. (Pl.'s Statement of Cause 1-2 ("Plaintiff contends that essentially sweeping the case at bar 'under the rug' with a rendering of 'MOOT' is to say that violation never occurred, after the Court has adjudicated thus far.").)

**D.  Possibility that Plaintiff Would Be Returned to NCC**

Sussex I is a security Level 5 facility, while NCC is a Level 4 facility.  (Defs.' Resp. Court's June 1, 2010 Mem. Order Re. Injunctive Relief Bass Aff. ("Bass Aff.") ¶ 3.)  According to Bass, the earliest Plaintiff will be eligible for a security level review would be June of 2011. (Bass Aff. ¶ 4.)  At that time, Plaintiff could return to NCC or another Level 4 facility.  (Bass Aff. ¶ 4.)  Due to the current waiting lists, it is likely that Plaintiff would not return to another Level 4 facility until late April of 2012.  (Bass Aff. ¶ 4.)

## IV. ANALYSIS

**A.  Equal Protection**

In order to survive summary judgment on his equal protection claim, "a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  Plaintiff has not sought to pursue an equal protection claim based on the fact that he was treated differently than the other Sunni Muslims who wished to engage in group Salat.  Rather, Plaintiff contends that his equal protection rights were violated because Defendant Vaughan "purposefully single[d] out religious practices observed only [by] Sunni adherents for scrutiny and prohibition."  (Compl. ¶ 35.)  Plaintiff, however, has not submitted evidence that other religious groups besides Sunni Muslims were permitted to conduct religious services on the recreation yard.  *Cooper v. Tard*, 855 F.2d 125, 129-30 (3rd Cir. 1988) (rejecting similar equal protection claim).  Furthermore, Plaintiff has failed to demonstrate that Defendant Vaughan intended to treat Plaintiff differently because he was a Sunni Muslim.  Accordingly, Claim One will be DISMISSED.

11

**B.    Due Process**

The Due Process Clause applies when government action deprives an individual of a legitimate liberty or property interest. *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 569 (1972). The first step in analyzing a procedural due process claim is to identify whether the alleged conduct affects a protected interest. *See Beverati v. Smith,* 120 F.3d 500, 502 (4th Cir. 1997). Liberty interests "may arise from the Constitution itself, by reason of guarantees implicit in the word liberty, . . . or [they] may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (internal citations and quotations omitted).

### 1.    Liberty Interest Conferred by the Constitution

"With respect to interests arising directly under the Due Process Clause, the Supreme Court has narrowly circumscribed its scope to protect no more than the 'the most basic liberty interests in prisoners.'" *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (*quoting Hewitt v. Helms*, 459 U.S. 460, 467 (1983)). "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes,* 427 U.S. 236, 242 (1976). Thus, "the liberty interest of a convicted defendant is substantially restricted and his confinement is properly subject to the management of prison officials, who for the order of the prison, the safety of prisoners, and the safety of themselves must have broad discretion in the management of the prison." *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991). "[C]hanges in a prisoner['s] location, variations of daily routine, changes in conditions of confinement (including

12

administrative segregation), and the denial of privileges-matters which every prisoner can anticipate are contemplated by his original sentence to prison-are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently." *Id.* (citing cases). Given these necessary restrictions, the Due Process Clause itself did not provide Plaintiff with a liberty interest in continuing to conduct his Salat on the recreation yards with other Sunni Muslim inmates. *See Beverati*, 120 F.3d at 504 (implicitly concluding confinement in segregation for six months, where inmates were denied access, *inter alia*, to all religious services, did not implicate a protected liberty interest conferred directly by the Constitution); *Caldwell v. Miller*, 790 F.2d 589, 595, 602-03 (7th Cir. 1986) (concluding total ban on group religious activities did not implicate a protected liberty interest).

### 2.     State-Created Liberty Interest

To the extent Plaintiff contends that he enjoys a state-created liberty interest in engaging in group Salat, he "must make a threshold showing that the deprivation imposed amounts to an 'atypical and significant hardship' or that it 'inevitably affect[s] the duration of his sentence.'" *Puranda v. Johnson*, No. 3:08CV687, 2009 WL 3175629, at *4 (E.D. Va. Sept. 30, 2009) (alteration in original) (*quoting Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995)). If Plaintiff makes this threshold showing, he then must identify the state regulatory or statutory language that creates a protected liberty interest in remaining free from restraints upon his ability to participate in group Salat. *See id.* In light of the considerable other opportunities for Plaintiff to practice his religion, the denial of the ability to engage in group Salat is not an "atypical and significant hardship." *Sandin*, 515 U.S. at 484; *see Beverati*, 120 F.3d at 504. Furthermore,

13

Plaintiff has not identified any statutory or regulatory language that confers a liberty interest in engaging in group Salat. *Puranda*, 2009 WL 3175629, at *4 (*citing Abed v. Armstrong*, 209 F.3d 63, 66 (2d Cir. 2000)). Accordingly, Claim Three will be DISMISSED.

### C. Free Exercise of Religion

Defendants do not contest that prohibiting Plaintiff from participating in group Salat substantially burdened Plaintiff in the free exercise of his religion. Defendants, however, contend that their actions pass constitutional muster because they satisfy the four-factor "reasonable relationship" test for analyzing the constitutionality of regulations that burden prisoners' fundamental rights set forth in *Turner v. Safley*. 482 U.S. 78, 89-91 (1987). *Turner* reconciled the principles that inmates retain certain important constitutional protections with the deference owed to prison administrators "by holding that restrictive prison regulations are permissible if they are reasonably related to legitimate penological interests, and are not an exaggerated response to such objectives." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (internal citation and quotation marks omitted). In assessing whether a regulation is reasonable, courts must consider (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," (2) whether "alternative means of exercising the right [exist] that remain open to prison inmates," (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) whether there was an "absence of ready alternatives" to the regulation in question. *Turner*, 482 U.S. at 89-90 (internal quotation marks omitted). Significantly, in conducting this inquiry, "[t]he burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S.

14

126, 132 (2003) (*citing Shaw v. Murphy*, 532 U.S. 223, 232 (2001); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987); *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977)).

Under the first factor, Defendants contend that restricting group religious activity to supervised in-room meetings promotes the legitimate penological interest of security. As noted by Defendants, unsupervised meetings could be used to plan a riot or for gang related activity. There is a valid rational connection between prohibiting unsupervised inmate group religious activity on the recreation yard and promoting institutional security. *Cooper*, 855 F.2d at 129-30 (upholding similar ban); *Allah v. Al-Hafeez*, 208 F. Supp. 2d 520, 532 (E.D. Pa. 2002) ("Clearly, there is a valid rational connection between limiting close group activity [on the recreation yard] and the prison's interest in controlling gang activity."). Thus, the regulation passes muster under the first factor.

The second *Turner* factor considers whether alternative means of exercising the right exist. As the right to free exercise must be construed "sensibly and expansively," *Thornburgh v. Abbott,* 490 U.S. 401, 417 (1989), it must be determined whether Plaintiff retains the ability to participate in other requirements of his religion. *O'Lone,* 482 U.S. at 352. Plaintiff has offered very little evidence on this score. Other than group Salat, Plaintiff generally complains that Warden Vaughan has restricted "when and where religious headgear could be worn." (Comp. ¶ 5.) Plaintiff, however, does not explain the significance of wearing headgear or provide any specific description of the restrictions imposed by Warden Vaughan. Moreover, the record establishes that Plaintiff's opportunity to engage in individual prayer is largely unrestricted and

15

that Plaintiff enjoys the opportunity to participate in congregational worship three times per week. Accordingly, the second factor favors the reasonableness of Defendants' restriction.

The third factor measures the impact of accommodating an inmate's religious exercise on the resources available in the prison. Defendants contend that allowing group gatherings on the recreation yard would require the hiring of additional security personnel, so that closer supervision could be provided. Thus, this factor does not favor Plaintiff. *See Veney v. Wyche*, 293 F.3d 726, 735 (4th Cir. 2002).

Under the fourth factor, Plaintiff bears the burden of suggesting an easy alternative that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 91. No such alternative has been suggested by Plaintiff. Instead, Plaintiff posits that Defendants' security concerns could be allayed by providing prison officials with a prayer schedule so that the prison officials would know the times during the recreational period the Sunni inmates would be gathering on the yard. Plaintiff fails to explain how the provision of the prayer schedule would ensure that inmates were not using the meeting as subterfuge for gang activity or for planning a riot or for other disruptive activity. Thus, this fourth factor favors Defendants. *Id.* at 90 (*citing Block v. Rutherford*, 468 U.S. 576, 587 (1984)).

Plaintiff persists that the limitation of group religious activity to a supervised, in-room setting is an exaggerated response to security concerns. Plaintiff notes that for ten years he led and participated in group Salat on the NCC recreation yard without disrupting prison security. Additionally, Plaintiff's evidence indicates that other Sunni Muslims continue to engage in group Salat, without causing any problems.

16

Where the gatherings are small, peaceful, and short, such as group Salat, Defendants apparently do not rigidly enforce the policy against unsupervised group worship on the recreation yard. Nevertheless, it is certainly rational to maintain the policy on paper as a hedge against the potential security threats posed by such gatherings. For example, the record indicates that Plaintiff was not merely participating in the group Salat, but acting in the role of a religious leader. *See Shabazz v. Ark. Dep't Corr.*, 157 F. App'x 944, 945-46 (8th Cir. 2005) (affirming District Court's conclusion that avoiding the elevation of one inmate to a position of religious leadership furthers prison security). Although troublesome, Defendants' selective enforcement does not render irrational their policy prohibiting unsupervised group religious activity on the recreation yard.

Furthermore, the fact that there are no documented instances of Sunni Muslims engaging in illicit activities during group Salat on the recreation yard does not significantly undermine the penological justification for Defendants' policy. Prison officials need not wait for a particular disruption to occur before they can take reasonable measures to abate it. *See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 470 (4th Cir. 1999). Rather, the Supreme Court has admonished that "[w]hen confronted with a threat to order, '[r]esponsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot.'" *Id.* (second alteration in original) (*quoting Jones*, 433 U.S. at 132-33). Considering the factors discussed above, Plaintiff fails to demonstrate that the prohibition on group religious activity on the NCC recreation yard is not rationally related to the legitimate

17

penological interest of security. Accordingly, Defendants' motion for summary judgment with respect to Claim Two will be GRANTED.

**D.   RLUIPA**

RLUIPA, however, provides considerably more protection for an inmate's religious exercise than does the First Amendment. *See Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir. 2006); *see Al-Amin v. Shear,* 325 F. App'x 190, 193 (4th Cir. 2009) (noting that district court's conclusion that inmate had alternative ways to practice his religion was not relevant under RLUIPA). Nevertheless, as explained below, on the current record, it does not appear that Plaintiff is entitled to any relief under RLUIPA.

**1.   Plaintiff Is Not Entitled to Monetary Damages Under RLUIPA**

RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). For purposes of this statute, "government" is defined to include:

"(i) a State, county, municipality, or other governmental entity created under the authority of a State;

(ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and

(iii) any other person acting under color of State law." *Id.* § 2000cc-5(4)(A).

Plaintiff seeks damages against the defendants in their individual capacities.[15] (Compl. 16.) In *Rendelman v. Rouse*, 569 F.3d 182 (4th Cir. 2009), the Fourth Circuit addressed the availability of damages under RLUIPA against state officials in their individual capacities. *Id.* at 187-89. The Fourth Circuit concluded that although Congress had the right to enact RLUIPA under the Spending Clause[16] to control the actions of state and local entities and officials who receive federal funding, it did not thereby authorize suits for monetary damages against state officials in their individual capacities. *Id.* at 189; *Jabbar v. Burnett*, No. 1:09cv246(TSE/TCB), 2010 WL 3671155, at *9 (E.D. Va. Sept. 9, 2010) (Ellis, J.) ("The Fourth Circuit has held that if jurisdiction under RLUIPA is based on the [S]pending [C]lause, RLUIPA does not authorize a claim for money damages against prison officials sued in their individual capacities." (*citing Rendelman,* 569 F.3d at 187-89)). The Fourth Circuit explained that when Congress desires to impose a condition under the Spending Clause, "it is Congress' burden to 'affirmatively impos[e]' [the] 'condition in clear and unmistakable statutory terms.'" *Rendleman,* 569 F.3d at 189 (*quoting Va. Dep't of Educ. v. Riley,* 106 F.3d 559, 563 (4th Cir. 1997) (alterations in original)). "The court reasoned that in simply defining 'government' in § 2000cc-2 to include a 'person acting under color of State law,' Congress did not signal with sufficient clarity and intent

---

[15] The United States Court of Appeals for the Fourth Circuit concluded that because RLUIPA did not waive the Eleventh Amendment immunity of the States, it "does not authorize claims for money damages against an official who is sued in [his or] her official capacity." *Rendelman v. Rouse,* 569 F.3d 182, 187 (4th Cir. 2009) (*citing Madison v. Virginia,* 474 F.3d 118 (4th Cir. 2006)).

[16] "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I. § 8, cl. 1.

to subject such a person to an individual capacity damages claims under RLUIPA." *Jabbar*, 2010 WL 3671155, at *9 (some internal quotation marks omitted) (*quoting Rendleman*, 569 F.3d at 189).

The Fourth Circuit acknowledged that "RLUIPA also purports to have an independent commerce clause basis." *Rendleman*, 569 F.3d at 189 (*citing* 42 U.S.C. § 2000cc-1(b)). The pertinent provision provides that "RLUIPA applies whenever 'the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.'" *Id.* (*quoting* 42 U.S.C. § 2000cc-1(b)). The plaintiff in *Rendleman*, however, "did not advance any claim that the substantial burden on his religious exercise caused by the denial of accommodations for his kosher dietary requirements would 'affect . . . commerce with foreign nations, among the several States, or with Indian tribes.'" *Id.* (*quoting* 42 U.S.C. § 2000cc-1(b)(2) (omission in original)). The Fourth Circuit therefore concluded an "independent commerce clause basis" for individual capacity damages was "not properly before the court." *Id.* Thus, when a "plaintiff makes no allegation that defendants' actions affected interstate commerce, it must be assumed that RLUIPA applies to them based solely on receipt of federal funds." *Jabbar*, 2010 WL 3671155, at *9 (*citing Brown v. Ray*, 695 F. Supp. 2d 292 (W.D. Va. 2010)).

Here, Plaintiff has not advanced any facts suggesting that the denial of the opportunity to engage in group Salat at prison affects interstate commerce. Therefore, he cannot proceed with his claim for monetary damages under RLUIPA. *Rendleman*, 569 F.3d at 189; *Jabbar*, 2010 WL 3671155, at *9; *Griffith v. Bird*, 3:06cv308-1-MU, 2009 WL 3722804, at *2 (W.D.N.C. Nov. 3,

2009). Accordingly, Plaintiff's claim for monetary damages under RLUIPA will be DISMISSED.

### 2. Plaintiff's RLUIPA Claims Against Defendants Is Moot

"[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." *Rendelman,* 569 F.3d at 186 *(citing Incumaa v. Ozmint,* 507 F.3d 281, 286-87 (4th Cir. 2007); *Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir. 1991); *Taylor v. Rogers,* 781 F.2d 1047, 1048 n.1 (4th Cir. 1986)). "The reasons for finding mootness in such a context are clear. Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of his claim." *Incumaa,* 507 F.3d at 287. Nevertheless, a plaintiff's claim should not be dismissed as moot if he presents sufficient evidence to conclude that his claim falls within an exception to above principle because the action is "'capable of repetition, yet evading review.'" *Id.* at 289 *(quoting Fed. Election Comm'n v. Wis. Right to Life, Inc.,* 551 U.S. 449, 462 (2007)).

To the extent Plaintiff seeks injunctive relief with respect to his confinement at NCC and these Defendants, his claims are moot. *Id.* at 287. Defendants have no authority over Sussex I where Plaintiff is currently confined. *See Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir. 2006) (dismissing as moot all of inmate's claims for injunctive relief against the prison officials at his former places of incarceration). Furthermore, Plaintiff cannot avoid the dismissal against these Defendants on the chance that he might be returned to NCC at some time in the future. *See Incumaa,* 507 F.3d at 289 (requiring a "'demonstrated probability'" that the allegedly improper

action will reoccur in order to avoid mootness (*quoting Murphy v. Hunt*, 455 U.S. 478, 483 (1982))); *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (concluding mere speculation that inmate might be retransferred to former facility is insufficient to prevent dismissal of claims on the grounds of mootness).

It remains to be determined whether officials at Sussex I currently are interfering with Plaintiff's ability to engage in group Salat. Plaintiff's vague response that "due to the defendants['] assertions, the plaintiff faces the same eminent [sic] threat of punishment for engaging in group Salat on the rec. yard at Sussex I as he did at NCC," (Pl.'s Br. Supp. Monetary Damages 3) sheds little light on the issue. *See United States v. Roane*, 378 F.3d 382, 400-01 (4th Cir. 2004) (observing that "[a]iry generalities, conclusory assertions and hearsay statements [do] not suffice to stave off summary judgment" ) (alteration in original; internal quotation marks omitted). Nevertheless, Defendants' submissions suggest that, even if not enforced, the VDOC has a policy against permitting group Salat on the recreation yards at its prisons. Defendants, however, have not specifically addressed whether banning group Salat on the recreation yard at Sussex I is the least restrictive means of furthering their allegedly compelling interest in security. Therefore, Defendants are not entitled to summary judgment with respect to any RLUIPA challenge by Plaintiff with respect to the conditions at Sussex I. *See Smith v. Ozmint*, 578 F.3d 246, 252-54 (4th Cir. 2009) (reversing grant of summary judgment on RLUIPA claim where defendants' primary affidavit did not address the circumstances at the institution where the plaintiff was incarcerated).

Moreover, no claim with respect to Sussex I is presently before the Court. The current complaint does not contain any allegations with respect to group Salat at that facility or name any

22

defendant connected with Sussex I or with authority over that institution. Given these circumstances and Plaintiff's recently ended *pro se* status, the Court will not dismiss the action at this time. Rather, the Court will grant Plaintiff thirty (30) days from the date of entry hereof to file an amended complaint which addresses Plaintiff's conditions at Sussex I and names as defendants the appropriate individuals. Such complaint will supplant the current complaint. Upon the filing of an amended complaint, the Court will determine whether the matter will proceed as an entirely new action.[17]

## V. CONCLUSION

Defendants' motion for summary judgment is GRANTED. Claims One, Two, and Three will be DISMISSED. Plaintiff's demand for monetary damages with respect to Claim Four will be DISMISSED. Plaintiff's demand for injunctive relief with respect to Claim Four will be DISMISSED AS MOOT. Defendants will be DISMISSED AS PARTIES to the present action. To the extent that Plaintiff wishes to pursue a complaint related to a violation of his rights under RLUIPA at Sussex I, he must file an appropriate amended complaint within thirty (30) days of the date of entry hereof.

An appropriate Order shall issue.

Dated: /2 - 8 - /0
Richmond, Virginia

/s/
_____
James R. Spencer
Chief United States District Judge

---

[17] If the Court determines that the matter should proceed as a new action, the Court will waive the filing fee associated with that action.

23